Filed 6/5/13  P. v. Glenn CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JAMES ROY GLENN,<br><br>    Defendant and Appellant. | G040608<br><br>(Super. Ct. No. FMBMS007714)<br><br>O P I N I O N |
| In re JAMES ROY GLENN<br><br>    on Habeas Corpus. | G041245 |

Appeal from an order of the Superior Court of San Bernardino County, Gilbert G. Ochoa, Judge.  Affirmed.  Original proceedings; petition for writ of habeas corpus, after an order of the Superior Court of San Bernardino County, Brian S. McCarville, Judge.  Petition denied.

Rudy Kraft, under appointment by the Court of Appeal, for Defendant, Appellant and Petitioner.

Kamala D. Harris, Attorney General, and Bradley A. Weinreb, Deputy Attorney General, for Plaintiff and Respondent.

*          *          *

## INTRODUCTION

James Roy Glenn was adjudged a sexually violent predator under the Sexually Violent Predator Act, Welfare and Institutions Code section 6600 et seq. (SVPA),[1] and was placed in involuntary commitment for an indeterminate term. Glenn was 82 years old at the time of trial in early 2008. He appealed, and later filed a petition for writ of habeas corpus also challenging the order of commitment. We issued an order to show cause and consolidated the writ petition with the appeal. We later issued an opinion affirming the order of commitment and denying the writ petition. (*People v. Glenn* (2009) 178 Cal.App.4th 778, review granted Feb. 10, 2010, S178140 (*Glenn I*).)

The California Supreme Court granted Glenn's petition for review and deferred further action in the matter pending consideration and disposition of *People v. McKee* (2010) 47 Cal.4th 1172 (*McKee I*). After issuing its opinion in *McKee I*, the California Supreme Court issued an order transferring this case back to us with directions to vacate our opinion and to reconsider the cause in light of *McKee I*. The Supreme Court further ordered: "In order to avoid an unnecessary multiplicity of proceedings, the court is additionally directed to suspend further proceedings pending finality of the proceedings on remand in *McKee* [*I*] [citation], including any proceeding in the Superior Court of San Diego County in which *McKee* may be consolidated with related matters."

Division One of the Fourth Appellate District of the Court of Appeal subsequently issued its opinion in *People v. McKee* (2012) 207 Cal.App.4th 1325 (*McKee II*). After the California Supreme Court denied review of *McKee II*, we issued an

---

[1]   Further code references are to the Welfare and Institutions Code unless otherwise noted.

2

order lifting the suspension of proceedings in this matter and inviting the parties to submit supplemental letter briefs addressing the effect of *McKee I* on Glenn's equal protection claim. Having considered the supplemental letter briefs, we now reject Glenn's equal protection claim. Our opinion includes issues and arguments addressed in *Glenn I* because the California Supreme Court ordered us to vacate that opinion. We again affirm the order of commitment and deny the petition for writ of habeas corpus.

## OVERVIEW OF THE SVPA

The SVPA provides for involuntary civil commitment of an offender immediately upon release from prison if the offender is found to be a sexually violent predator. (*People v. Yartz* (2005) 37 Cal.4th 529, 534.) The SVPA "was enacted to identify incarcerated individuals who suffer from mental disorders that predispose them to commit violent criminal sexual acts, and to confine and treat such individuals until it is determined they no longer present a threat to society." (*People v. Allen* (2008) 44 Cal.4th 843, 857.) "'[A]n SVPA commitment proceeding is a special proceeding of a civil nature, because it is neither an action at law nor a suit in equity, but instead is a civil commitment proceeding commenced by petition independently of a pending action.'" (*People v. Yartz*, *supra*, at p. 536.)

A sexually violent predator is defined as "a person who has been convicted of a sexually violent offense against one or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior." (§ 6600, subd. (a)(1).) A "diagnosed mental disorder" is defined to include "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes the person to the commission of criminal sexual acts in a degree constituting the person a menace to the health and safety of others." (§ 6600, subd. (c).)

The procedure for determining whether a convicted sex offender is a sexually violent predator typically begins when an inmate is scheduled to be released

3

from custody. (*Turner v. Superior Court* (2003) 105 Cal.App.4th 1046, 1054.) "'Under section 6601, whenever the Director of Corrections determines that a defendant serving a prison term may be a sexually violent predator, the Department of Corrections and the Board of Prison Terms undertake an initial screening "based on whether the person has committed a sexually violent predatory offense and on a review of the person's social, criminal, and institutional history." (§ 6601, subd. (b).)'" (*People v. Hurtado* (2002) 28 Cal.4th 1179, 1182-1183.)

The screening is conducted in accord with an assessment protocol developed by the State Department of Mental Health (DMH). (*People v. Hurtado*, *supra*, 28 Cal.4th at p. 1183.) "'If that screening leads to a determination that the defendant is likely to be a sexually violent predator, the defendant is referred to the Department of Mental Health for an evaluation by two psychiatrists or psychologists. (§ 6601, subds. (b) & (c).) If both find that the defendant "has a diagnosed mental disorder so that he or she is likely to engage in acts of sexual violence without appropriate treatment and custody" (§ 6601, subd. (d)), the department forwards a petition for commitment to the county of the defendant's last conviction (*ibid.*). If the county's designated counsel concurs with the recommendation, he or she files a petition for commitment in the superior court. (§ 6601, subd. (i).)'" (*Ibid.*)

"[A] petition seeking the commitment or recommitment of a person as a sexually violent predator cannot be filed unless two mental health professionals, specifically designated by the Director under statutory procedures to evaluate the person for this purpose, have agreed, by correct application of the statutory standards, that the person 'has a diagnosed mental disorder so that he or she is likely to engage in acts of sexual violence without appropriate treatment and custody.'" (*People v. Superior Court (Ghilotti)* (2002) 27 Cal.4th 888, 894.)

If one of the two professionals performing the evaluation does not conclude the person meets the criteria for commitment as a sexually violent predator, and the other

4

concludes the person does meet those criteria, then the DMH "shall arrange for further examination of the person by two independent professionals selected in accordance with subdivision (g)." (§ 6601, subd. (e).) If an evaluation by two independent professionals is conducted, a petition for commitment may be filed only if both concur the person meets the criteria for commitment as a sexually violent predator. (§ 6601, subd. (f).)

Upon filing of the SVPA commitment petition, the superior court must review the petition and determine "whether the petition states or contains sufficient facts that, if true, would constitute probable cause to believe that the individual named in the petition is likely to engage in sexually violent predatory criminal behavior upon his or her release." (§ 6601.5.) If the court determines the petition on its face supports a finding of probable cause, then it orders the person named in the petition to be kept in a secure facility until a probable cause hearing under section 6602 is conducted. (§ 6601.5.) The probable cause hearing must be conducted within 10 calendar days of the issuance of the order finding the petition would support a finding of probable cause. (*Ibid.*)

The purpose of the probable cause hearing is to determine whether "there is probable cause to believe that the individual named in the petition is likely to engage in sexually violent predatory criminal behavior upon his or her release." (§ 6602, subd. (a).) The probable cause hearing is an adversarial hearing where the person named in the petition has the right to counsel. (*Ibid.*) If the court finds probable cause, it orders a trial to determine whether the person is a sexually violent predator under section 6600. (§ 6602, subd. (a).) The person named in the petition must remain in a secure facility between the time probable cause is found and the time trial is completed. (*Ibid.*)

The person named in the petition is entitled to a trial by jury, and the jury's verdict must be unanimous. (§ 6603, subds. (a) & (f).) The person named in the petition also is entitled to retain experts or professional persons to perform an examination on his or her behalf. (§ 6603, subd. (a).) At trial, the trier of fact determines whether, beyond a reasonable doubt, the person named in the petition is a sexually violent predator.

5

(§ 6604.)  If the trier of fact determines the person named in the petition is a sexually violent predator, the person is committed for an indefinite term to the custody of the DMH for appropriate treatment and confinement in a secure facility.  (*Ibid.*)

**FACTS**

**I.**

***The People's Case***

In 2005, the Office of the District Attorney of San Bernardino County filed a petition for Glenn's commitment as a sexually violent predator pursuant to section 6600 et seq.  At the jury trial, conducted in January and February 2008, the deputy district attorney called Jeffery Hart and licensed psychologists Mark A. Schwartz and Dawn Starr as witnesses.  Hart had been Glenn's former neighbor in North Carolina, and Schwartz and Starr had evaluated Glenn and testified he qualified as a sexually violent predator.  The deputy district attorney also called Glenn to testify as an adverse witness.

A.  *Jeffery Hart*

In 2000, Glenn purchased two acres in rural North Carolina and lived there in a mobilehome.  Jeffery Hart was Glenn's neighbor.  Hart and Glenn initially got along well, but they had a falling out because Glenn wandered around his property in the nude.  Glenn cut down the trees on his property, and would situate himself in his yard or on his roof to make himself visible.  On several occasions, Hart's mother, who lived with Hart, saw Glenn naked.  Hart asked Glenn not to appear naked in front of her.  According to Hart, Glenn "just got bolder and bolder every day."

One morning, Hart informed Glenn that four women were coming to look at nearby property and asked that he wear clothing when they arrived.  When the women drove up the road, Glenn, wearing only fishnet underwear, blocked the road with his backhoe.  Glenn got down from the backhoe and walked over to talk with the women.

6

Glenn twice told Hart that Glenn needed "a young boy" to help with work around the house. Hart did not recommend anyone to Glenn and testified, "by the way he was acting, I wouldn't subject any kid to that."

B.  *Mark A. Schwartz*

Mark A. Schwartz holds a Ph.D., had been a licensed psychologist for 27 years, and worked under contract for the DMH. He interviewed Glenn in 2005 and 2006 and prepared reports in January and November 2007. Schwartz considered three criteria: (1) whether Glenn committed qualifying predicate offenses; (2) whether he has a mental disorder predisposing him to commit future sexual offenses; and (3) whether he is at risk of committing future sexual offenses.

Under the first criterion, Schwartz concluded Glenn had committed four predicate offenses against three victims, all of whom were under 14 years of age. In 1988, Glenn invited a nine-year-old boy and an 11-year-old boy to his house, where he gave them treats, showed them sexually explicit movies, exposed himself, and touched them. As a result, a jury convicted him of two counts of committing lewd and lascivious acts with a child under the age of 14. Also in 1988, Glenn molested a seven-year-old girl by exposing himself and masturbating in front of her, for which another jury convicted Glenn of two counts of the same crime.

Schwartz also explained that Glenn had been convicted of offenses that did not qualify as predicate offenses for a sexually violent predator determination. Glenn had been convicted of an attempt to commit lewd and lascivious acts with a child under the age of 14 for exposing himself to and masturbating in front of a boy. Glenn also had been convicted on two indecent exposure charges involving two girls. Schwartz testified he "really didn't have to" consider those incidents, but they "just hardened the fact that [Glenn] was a pedophile."

7

Under the second criterion, Schwartz concluded Glenn suffers from pedophilia, nonexclusive, with sexual attraction to both male and female children.[2] Schwartz based his conclusion of pedophilia on Glenn's qualifying and nonqualifying offenses, and incidents appearing in police reports that did not lead to charges. Schwartz concluded Glenn was volitionally impaired from pedophilia because he continued to engage in pedophilic behavior even after being arrested and imprisoned for sex crimes.

Under the third criterion, Schwartz concluded there was a serious and well-founded risk that Glenn would commit sexually violent criminal acts in the future. Schwartz considered Glenn's score on the Static-99, an actuarial tool used to predict recidivism in sex offenders. Although Glenn's score of seven on the Static-99 usually would place him in the high risk category, Schwartz was not certain whether Glenn would fall into that category because he was much older than all but one person in the data set on which the Static-99 was based. Schwartz testified: "We don't have a lot of data on 82-year-old-guys. When you look at the number of people in these data sets that are past 60, 75, 80, very, very few."

Schwartz testified he initially did not believe Glenn qualified as a sexually violent predator because of his advanced age and because the qualifying offenses occurred a long time ago. Schwartz ultimately concluded Glenn was a sexually violent predator based on his score on the Static-99, the fact Glenn had continued to act out sexually, and Schwartz's opinion that pedophilia is a compulsive and chronic condition. Schwartz considered "the incidents in North Carolina and the indecent exposure in North Carolina as an indication that [Glenn] was still . . . sexually acting out and at risk." Despite studies suggesting recidivism rates for pedophiles decrease after age 60,

---

[2] Schwartz defined pedophilia as having two components. The first is "recurrent intense sexually arousing fantasies or sexual urges or behaviors . . . with prepubescent children . . . over a period longer than six months." The second is "the person has acted on the urges or the fantasies . . . [a]nd/or the fantasies have caused marked distress in his life."

8

Schwartz believed Glenn posed a risk of reoffending because he had engaged in serious acts of pedophilia at age 62.

Schwartz also diagnosed Glenn with exhibitionism.[3] Schwartz initially "wavered back and forth" on that diagnosis because it requires exposing oneself to unsuspecting strangers. Ultimately, Schwartz concluded the women in North Carolina who saw Glenn in fishnet underwear were strangers, thus satisfying the definition of exhibitionism.

## C. *Dawn Starr*

Dawn Starr holds a Ph.D. in psychology and had been a licensed psychologist for over 20 years when she testified. She served on the DMH's sexually violent predator panel of evaluators and had conducted over 1,000 sexually violent predator evaluations. She conducted a sexually violent predator evaluation of Glenn in July 2005 and conducted follow-up evaluations of him in August 2006 and September 2007.

Starr concluded Glenn committed qualifying predicate offenses, had a mental disorder predisposing him to commit future sexual offenses, and was likely to commit future sexually violent predatory offenses as a result of his mental disorder.

Starr diagnosed Glenn with "pedophilia, sexually attracted to male and female children, but a non-inclusive type, meaning he's had adult sexual partners." Starr testified, "[t]hat was an SVP [(sexually violent predator)] diagnosis because I thought that he showed both volitional and emotional impairment with regards to that diagnosis." She believed Glenn was volitionally impaired because he "gets in very little trouble with the law" and "[i]s not a rule breaker," yet had serious difficulty controlling his sexual behavior. As to emotional impairment, Starr testified: "[H]e is taking advantage of these children, most of whom were either in situations where they were low income or the

---

[3] Schwartz defined exhibitionism as the tendency to expose one's genitals to unsuspecting strangers.

parents were maybe neglectful or not around very much. And he would groom them, give them candy, put on cartoons maybe and then switch over to sexually explicit movies. Fix the boys' bikes. [¶] And then he would sexually abuse them for his own personal gratification with little or no regard to the adverse consequences of these children."

Starr considered several nonqualifying crimes and victims because "under the diagnostic criteria . . . we're supposed to look at whether the person has recurrent intense sexually arousing deviant fantasies or urges or behaviors towards prepubescent children. So I'm interested to see how many people or young children he's had sexual contact with over what period of time."

Starr's conclusion that Glenn committed the qualifying predicate offenses was based on his convictions in 1988 for committing lewd and lascivious acts with a child under the age of 14 involving the girl and the two boys. Starr also considered these nonqualifying crimes and victims in reaching her diagnosis:

In the 1950's or 1960's, one of Glenn's daughters reported that Glenn had sexually molested her when she was a child.

In 1976, when Glenn was 50 years old, he was arrested and charged with two counts of lewd and lascivious behavior with a child under 14 years old in violation of Penal Code former section 288. (Ultimately, he was convicted of contributing to the delinquency of a minor.)

In 1977, Glenn took a nine-year-old girl and a seven-year-old boy to Big Bear, where he exposed himself to them, bathed with them, fondled and orally copulated the girl, and had the boy use a relaxer on Glenn until he ejaculated.

In 1986, a mother left her three children with Glenn while she moved into a new home. Glenn licked the 10-year-old girl between the legs, then tried to "hypnotize" her. Glenn touched her six-year-old brother's penis.

In 1987, Glenn molested his seven-year-old granddaughter and four-year-old grandson. The granddaughter reported that Glenn carried her to the living

10

room, put his hand over her mouth, pulled down her underwear, and touched her groin. The grandson reported that Glenn touched his penis.

Starr concluded Glenn currently suffers from pedophilia, despite his age, because it is a chronic and lifelong condition. Significant too, Starr found that Glenn used the victims for his own gratification, did not accept responsibility for his conduct, and showed no remorse.

Starr also diagnosed Glenn with exhibitionism, which she described as a type of paraphilia. Her diagnosis of exhibitionism was based on Glenn's claim to be a nudist and a pattern of conduct in which he appeared to go out of his way to expose himself to others.

Starr concluded Glenn likely would engage in future sexually violent predatory behavior as a result of his mental disorder. Like Schwartz, Starr used the Static-99 and gave Glenn a total score of eight, placing him in the highest risk of reoffense category. She placed Glenn in the "rare group of people" who, despite advanced age, would continue to sexually reoffend. She considered Glenn's age, good health, and family history of longevity to conclude a five- to eight-year risk prediction period to be appropriate.

Starr believed Glenn's age lowered the risk of reoffense a little, but not enough to take Glenn out of the high risk category. She explained: "[H]e is exactly the same man he is today as he was when he committed the offenses in the late 1980s. His personality is the same; his attitude about them is the same. Either it was no big deal or I did not do it. [¶] He has not done anything to try to get treatment for that in the community or now that it's available to him at absolutely no cost where he's staying. He doesn't go do that. He is in pretty good physical health. He has good mental capacity. So the only thing is, he is a little older and he is still sexually preoccupied."

11

## D. *Glenn*

The deputy district attorney called Glenn as an adverse witness. He testified he was a nudist and denied committing all but one of the qualifying and nonqualifying offenses.

Glenn claimed he had been falsely accused in each instance and gave various reasons why. As to the incident in Big Bear in 1977, Glenn claimed the mother told her children to accuse Glenn of molesting them because he had kicked her out of his house. As for the incident in 1986, Glenn claimed the 10-year-old girl made obscene telephone calls to him, and falsely accused him of molestation for fear he would tell her mother about the calls. Glenn denied molesting his grandchildren, claiming his son had been "wasted on drugs."

Glenn asserted he did not commit the crimes for which he was convicted in 1989. Glenn claimed the two boys came over to his house to repair their bicycles. Glenn showered, and when he came out of the shower, the boys were on his bed watching a pornographic video and the 11-year-old boy had an erection. Glenn claimed he ran the boys out of the house. According to Glenn, the pornographic video belonged to a friend.

As for the conviction involving the girls, Glenn testified they would come into his apartment without knocking. On one occasion, he stepped out of the shower to find three girls in his bathroom looking at him. On another occasion, one of the girls walked into his apartment, unannounced, and Glenn, a nudist, was naked. The girl said, "[g]et some clothes on"; Glenn replied, "you better start getting use to it if you don't start knocking."

Glenn was arrested, convicted by two separate juries, and sent to prison. He was released in 1995, and, in 1998, bought two acres of land in North Carolina, where he continued to practice nudism. He contended Hart's mother would hide in the bushes with binoculars to watch him naked. She had tried to "put the make on [him]," but he was not interested in her, and she complained to the police in anger. According to Glenn,

12

none of the 13 people who complained to the police about his nudity had ever seen him naked. He also claimed Hart's testimony that Glenn had asked about finding a young boy to work for him was a lie.

On the day the women came by to inspect property, Glenn wore the fishnet underwear because "from a distance it just looks like regular shorts." He did not expect he would have to step down from his backhoe to see anyone.

Glenn testified he had been impotent since undergoing chemotherapy for colon cancer in 1996. He testified he loved children, and "[w]hen I see children with a problem, my heart bleeds for them."

## II.

### *Defense Case*

Glenn called licensed clinical psychologists Brian Abbott and Craig Updegrove to testify on his behalf.

#### A. *Brian Abbott*

Brian Abbott testified he is a licensed clinical psychologist, has a forensic psychological practice, and primarily evaluates sex offenders, including sexually violent predators.

Abbott reviewed Glenn's medical and hospital records, law enforcement reports, probation reports, DMH evaluator reports, and investigative reports prepared by the district attorney's office and by the public defender's office. Abbott interviewed Glenn three times, and administered a general personality test, the Millon Clinical Multiaxial Inventory-III, The Abel Assessment for sexual interest-2, and a cognitive functioning test.

Abbott concluded, "[t]here's absolutely no information to substantiate a current diagnosis of pedophilia or to substantiate a current mental disorder under the Sexually Violent Predator Act." In reaching that conclusion, Abbott observed that Glenn had displayed no symptoms of sexual interest in children for 20 years and found it critical

13

that no reports were made of Glenn engaging in inappropriate conduct with children during the seven-year period in which he was not in custody. There was no evidence that, since Glenn had been committed as a sexually violent predator, he had engaged in the type of conduct typical of someone with a current diagnosis of pedophilia. Because Glenn interacted sexually with both adults and children, Abbot believed his conduct might be the result of sexual compulsiveness rather than pedophilia.

Abbott testified that sex drive decreases dramatically in people over 50 years old. He acknowledged pedophilia is a chronic condition for some people, but testified it was not chronic in Glenn's case. He found no indication that Glenn currently had any sexual interest in prepubescent children and was not likely to reoffend in a sexually violent manner. Abbott declined to diagnose Glenn with exhibitionism because he did not expose himself for sexual gratification or to unsuspecting strangers.

## B. *Craig Updegrove*

Craig Updegrove holds a Ph.D. in clinical psychology, was a licensed psychologist, and, since 1996, had served on the DMH's panel of sexually violent predator evaluators.

Under appointment by the DMH, Updegrove conducted an evaluation of Glenn in July 2005. Updegrove concluded Glenn did commit the qualifying offenses, had a diagnosable mental disorder within the meaning of the SVPA, but was not likely to reoffend in a sexually violent, predatory manner.

Updegrove reached the same conclusions after reevaluating Glenn in October 2006. Again diagnosing Glenn as having pedophilia, Updegrove acknowledged, "he's had this recurrent pattern of sexually aroused behavior around prepubescent children" and recognized Glenn's score on the Static-99 placed him in the high risk of reoffense category.

Updegrove concluded nonetheless that Glenn did not pose a serious and well-founded risk of sexually reoffending. In reaching that conclusion, Updegrove

14

considered Glenn's age, the lack of evidence of offending behavior after 1988, and chemotherapy in 1996, which, according to Glenn, had left him impotent. Updegrove found it significant that Glenn had no known sexual offenses against children in the eight-year period from his release from prison to his conviction for indecent exposure. Updegrove did not diagnose Glenn with exhibitionism because he found no evidence that Glenn exposed himself in North Carolina for sexual gratification.

### APPELLATE AND HABEAS PROCEDURAL HISTORY

In February 2008, the jury found Glenn to be a sexually violent predator, and the trial court ordered him committed for an indeterminate term. Glenn timely appealed from the commitment order. In October 2008, he filed a petition for writ of habeas corpus in the trial court. The trial court denied the petition, stating: "Petitioner's claims are currently being adjudicated within the Court of Appeal. There is nothing contained in the Petition to substantiate Petitioner's claims. A Petition for Writ of Habeas Corpus cannot serve as a substitute for Appeal."

In November 2008, Glenn, representing himself in propria persona, filed a petition for writ of habeas corpus in this court, challenging the validity of the SVPA commitment petition on the ground the evaluations were based on an invalid standardized assessment protocol. We issued an order to show cause, consolidated the writ petition with the appeal, and invited the Attorney General to file a combined respondent's brief and return to the petition. In *Glenn I*, we affirmed the order of commitment and denied the petition for writ of habeas corpus.

### DISCUSSION

### I.

### *The Trial Court Did Not Err by Sustaining Objections to Abbott's Testimony.*

Glenn argues the trial court erred by precluding Abbott from testifying about studies and research conducted by other mental health experts concerning whether

15

pedophilia is chronic. Glenn contends such testimony was admissible to establish the basis for Abbott's expert opinion. Relying on *People v. Campos* (1995) 32 Cal.App.4th 304 (*Campos*), the Attorney General argues an expert witness may not testify on direct examination to the contents of reports or opinions expressed by other experts. We conclude the trial court did not err.

A. *Background*

During Abbott's direct examination by Glenn's counsel, the following colloquy occurred:

"A [(Abbott):] . . . First, you have to prove the fact that they do have what they refer to as pedophiliac arousal. You have to first be able to show that the individual was sexually aroused toward prepubescent children, and then if they act upon that, then you can make the diagnosis. You cannot make the diagnosis based on the number of prepubescent victims over time. In fact, one of the criteria text editors—

"Ms. Norman [(the deputy district attorney)]: Objection.

"The Court: Sustained.

"Q (By Mr. Lowry [(Glenn's counsel)]:) Have you read documents that indicate to you that behavior alone is not enough to make the diagnosis of pedophilia?

"Ms. Norman: Objection, your Honor. May we approach?

"The Court: Yes."

The court did not immediately rule on the second objection.

Later, Abbott testified he did not subscribe to the belief that pedophilia is chronic. When he was asked to explain, the following transpired:

"A [(Abbott):] Because essentially when you look at the literature from which that statement is made, it goes back to I think really the early 1990's when the last major revision of the DSM Four [American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (4th ed. 2000)] happened, at least as it relates to diagnosis of pedophilia. In fact, there was an author by the name of Michael Seto who

16

published a chapter in a book that came out three weeks ago where he states that this idea of pedophilia being tending to be chronic really—

"Ms. Norman: Objection, your Honor.

"The Court: Sustained.

"Mr. Lowry: Okay.

"Ms. Norman: Move to strike.

"The Court: The testimony with regard to what the other doctor testified to would be stricken.

"Mr. Lowry: Okay.

"Q (By Mr. Lowry:) . . . In the literature, is there an indication that there's a question as to whether or not pedophilia is chronic?

"Ms. Norman: Objection. Same objection.

"The Court: Sustained.

"The witness [(Abbott)]: Yes.

"Ms. Norman: Move to strike.

"The Court: The answer will be stricken."

A few moments later, the court overruled a similar objection but advised Glenn's counsel to "be careful in this area."

Outside the jury's presence, the court and counsel discussed whether Abbott could testify about studies and research conducted by other mental health experts concerning whether pedophilia is chronic. Glenn's counsel announced that, over the lunch break, he and Abbott had pared down a PowerPoint presentation to 22 "slides," all of which were graphs taken from studies, and argued Abbott should be permitted to testify about the slides as part of the basis for his opinion: "It just makes no sense for him not to be able to use at least these [P]ower[P]oint slides having to do with plotting of graphs and the statistics in order to aid his testimony." The deputy district attorney

17

objected on the ground the material in the PowerPoint presentation had not been produced in discovery.

The trial court stated: "I still think that this is a *Campos* issue. If you have a graph, for instance, Graph A, and at the bottom it looks like we have 'age' is the input. And on the left-hand side we have 'percentages[,'] six-year rate of recidivism. [¶] Just because something is in a graph, you're still trying to get in the opinion of this expert via a graph, it's just not coming in via Dr. Abbott testifying about it. It's still the same thing. It's still going to be hearsay that [the People] cannot cross[-]examine Doctor Milloy on this graph. So we still have the same issue." (Italics added.) The court explained Abbott could testify to his own opinions and even use the graphs prepared by the nontestifying experts, if he deleted the nontestifying experts' names. The court stated: "If it's his opinion, he can relate it, because that's his opinion based upon his training, his expertise, his evaluation, and how it relates to Mr. Glenn based upon his evaluation of Mr. Glenn. He can testify to that. [¶] He just can't testify and throw up on the screen 'this is Milloy's opinion with regards to six-year recidivism rates.' That he can't do. But he may be able to give the same information in [it] if it's his opinion in a different way."

B. *Case Law Regarding Admissibility of Nontestifying Experts' Studies and Opinions*

In *Campos*, *supra*, 32 Cal.App.4th at page 306, the defendant appealed a jury determination he was a mentally disordered offender. The defendant argued the trial court erred by permitting the prosecution's expert psychiatrist, Dr. Mertz, to testify that she relied on other medical evaluations of the defendant and that the evaluations confirmed her opinion he was a mentally disordered offender. (*Id*. at p. 307.) The appellate court agreed. A psychiatrist, like other expert witnesses, may rely on reliable hearsay, including the statements and reports of other treating professionals in forming an opinion, and, on direct examination, may testify the reports of the other experts were a basis for that opinion. (*Id.* at pp. 307-308.) However, an expert witness may not, on

18

direct examination, reveal the contents of the other experts' reports or opinions expressed in the reports. (*Id.* at p. 308.) "Here, the reports of the nontestifying experts were hearsay. Doctor Mertz was properly allowed to testify that she relied upon the reports in forming her own opinions. The trial court erred, however, when it allowed her to reveal their content on direct examination by testifying that each prior medical evaluation agreed with her own opinion." (*Ibid.*) While doctors can testify about the basis for their opinion, they cannot disclose to the jury the opinions of out-of-court doctors. (*Ibid.*) The appellate court nonetheless affirmed because, it concluded, Dr. Mertz's testimony about prior medical evaluations was not prejudicial. (*Id.* at pp. 308-309.)

Glenn argues *Campos* is inapplicable because the nontestifying experts in that case had evaluated and prepared reports on the defendant. Here, in contrast, Abbott was precluded from testifying about *nontreating* experts' opinions on whether pedophilia in general is a chronic condition.

*Campos* is the product of a line of authority starting with *Kelley v. Bailey* (1961) 189 Cal.App.2d 728, 737-738, in which the court held a testifying physician could not rely on a report of another physician as independent proof of facts, but could rely on it as part of the basis on which the testifying physician formed a diagnosis and course of treatment. On request, the jury should be given a limiting instruction that the hearsay is admitted as the basis for the testifying physician's diagnosis, not to prove the truth of what the patient told the original physician. (*Id.* at p. 738.)

The California Supreme Court adopted this general rule in *Whitfield v. Roth* (1974) 10 Cal.3d 874, 894-895, stating: "It is obvious that the testimony concerning the opinion of the other doctors who were not present in court, and who had not been qualified as experts was hearsay. '"The reason for this is obvious. The opportunity of cross-examining the other doctors as to the basis for their opinion, etc., is denied the party as to whom the testimony is adverse."' [Citations.] [¶] Defendants contend, however, that the testimony concerning the opinions of the other doctors was admissible to show

19

the basis of the testifying doctor's opinion under the doctrine of limited admissibility as applied in *Kelley* [*v.*] *Bailey* . . . . This rule has no application to the case at bench for two reasons. First, the opinions of the out-of-court doctors in this case were not used by either testifying doctor in the course of treatment or diagnosis of plaintiff. They were consulted as experts and then called as witnesses to offer expert opinion evidence. It is clear that doctors can testify as to the basis of their opinion [citation], but this is not intended to be a channel by which testifying doctors can place the opinion of innumerable out-of-court doctors before the jury." (Fn. omitted.) The court held the testimony concerning the opinion of the nontestifying doctors was inadmissible on the ground it was being offered as independent proof of the fact in issue—that an X-ray of the patient's skull showed no abnormality. (*Id.* at p. 895.)

In *People v. Coleman* (1985) 38 Cal.3d 69, 92, the Supreme Court expressed the rule: "'"While an expert may state on direct examination the matters on which he relied in forming his opinion, he may not testify as to the details of such matters if they are otherwise inadmissible. [Citations.] The rule rests on the rationale that while an expert may give reasons on direct examination for his opinions, including the matters he considered in forming them, he may not under the guise of reasons bring before the jury incompetent hearsay evidence. [Citation.]'"

These cases permit an expert witness to testify about the contents or details of the matters on which the expert relied, including the opinions of nontestifying experts, if those matters and opinions are otherwise admissible. If the contents or details of the matters on which the expert relied, including the opinions of nontestifying experts, are otherwise inadmissible, for example, they are offered to prove the truth of a fact in issue, they may not be disclosed.

An illustrative and analogous case is *Mosesian v. Pennwalt Corp.* (1987) 191 Cal.App.3d 851. In that case, the plaintiff, the owner of a vineyard, alleged a pesticide manufactured by one of the defendants caused chemical burning of grape leaves

20

leading to defoliation and crop destruction. (*Id.* at p. 855.) The defendant's expert testified the pesticide did not chemically burn the leaves on the plaintiff's grapevines. (*Id.* at pp. 856-857.) During the course of direct examination, the expert testified he had consulted with six other experts about the potential of the pesticide to cause leaf burn and had based his own opinion in part on those other experts' opinions. (*Id.* at p. 856.) None of the six other experts testified. (*Id.* at p. 857.) Also on direct examination, the expert revealed those experts had concluded the defendant's pesticide could not cause more than marginal leaf burn. (*Id.* at pp. 857, 863.) The trial court permitted the testimony but admonished the jury the nontestifying experts' opinions could only be considered as part of the basis for the testifying expert's opinion and could not be considered as proof the pesticide did not damage the plaintiff's vineyard. (*Id.* at p. 857.) The jury returned a defense verdict, and the trial court granted the plaintiff's motion for a new trial. (*Id.* at p. 858.)

The Court of Appeal concluded the testifying expert's testimony on the opinions of the nontestifying experts was inadmissible hearsay because the opinions were offered for the truth of the matter asserted—that the defendant's pesticide did not cause more than marginal leaf burn. "The fundamental issue that stood as the cornerstone of the entire trial was whether the plaintiff suffered a crop loss. The introduction of the hearsay opinions through [the defense expert] touched upon only one aspect of economic crop loss. Can [the pesticide] ever cause leaf burn and does leaf burn lead to a loss of production? If the leaf burn complained of by the plaintiff could only be marginal, then the probability of economic loss was remote." (*Mosesian v. Pennwalt Corp.*, *supra*, 191 Cal.App.3d at p. 866.) But the Court of Appeal reversed the order granting a new trial, concluding admission of the hearsay opinions was harmless error because the opinions touched on only one issue in the case, the great weight of the evidence supported the defense verdict, and the trial court had admonished the jury. (*Id.* at pp. 866-867.)

21

In *Mosesian v. Pennwalt Corp.*, the nontestifying experts did not opine whether the pesticide damaged the plaintiff's vineyard; rather, they opined whether the pesticide *could ever* cause leaf burn.  Their opinions were inadmissible because they were offered to prove a disputed fact—whether the pesticide could cause leaf burn, and thus might have damaged the plaintiff's vineyard.

### C. *Application to This Case*

Here, the nontestifying experts'[4] opinions and studies related to whether pedophilia in general is chronic.  The only conceivable purpose of offering the opinions and studies of Seto, Milloy, and other nontestifying experts (via the PowerPoint presentation) was to prove the truth of a disputed fact—whether pedophilia is chronic, and, thus, whether Glenn could still suffer from it.  Although Abbott could testify to his own opinions and describe the matters he considered in reaching those opinions, he could not testify to the opinions of the other nontestifying experts, explain or read their writings, or present graphs and charts revealing their opinions that were otherwise inadmissible.

Glenn argues, "if the testimony relating to Michael Seto as to whether or not pedophilia is a chronic disorder and the use of the graph prepared by Milloy was invalid then it was equally invalid to introduce Dr. Hanson's opinion as to [Glenn]'s likely recidivism rate thr[ough] the use of the STATIC-99."  But neither in the appellant's opening brief nor in the appellant's reply brief, does Glenn include record citations supporting that argument.  Glenn concedes nobody objected to the challenged testimony, and, therefore, any claim of error has been forfeited.

---

[4] Specifically, Abbott was precluded from testifying (1) certain text authors had concluded pedophilia cannot be diagnosed based on the number of prepubescent victims over time; (2) Michael Seto had written a book in which he concluded pedophilia was not necessarily chronic; and (3) as shown in the PowerPoint demonstration, Dr. Milloy and other experts in the field had reached the same conclusion.  Glenn also argues he should have been able to introduce a graph prepared by Milloy on six-year recidivism rates.

In addition, "[b]ecause an expert's need to consider extrajudicial matters, and a jury's need for information sufficient to evaluate an expert opinion, may conflict with an accused's interest in avoiding substantive use of unreliable hearsay, disputes in this area must generally be left to the trial court's sound judgment." (*People v. Montiel* (1993) 5 Cal.4th 877, 919.) The trial court may exclude from an expert's opinion testimony any hearsay matter if its probative value is outweighed by its irrelevance, unreliability, or potential prejudice. (*People v. Catlin* (2001) 26 Cal.4th 81, 137.) The trial court did not abuse its discretion in sustaining the objections to the PowerPoint presentation.

## II.

### *Use of an Invalid Standardized Assessment Protocol Did Not Deprive the Trial Court of Fundamental Jurisdiction; Therefore, a Harmless Error Analysis Applies, and Glenn Suffered No Prejudice.*

Glenn argues his commitment as a sexually violent predator was illegal because the evaluations leading to the SVPA commitment petition were based on the mental health assessment protocol later determined by the Office of Administrative Law (OAL) to be invalid as "underground regulations." The Attorney General argues (1) Glenn forfeited the issue by failing to object at the probable cause hearing held pursuant to section 6602, subdivision (a), and (2) any error in using the assessment protocol was harmless.

Glenn did not forfeit the issue, but use of the invalid assessment protocol did not deprive the trial court of fundamental jurisdiction. Because Glenn is challenging the evaluations after trial, he must show he was deprived of a fair trial or suffered prejudice as a result of the use of the assessment protocol. (*People v. Landau* (2013) 214 Cal.App.4th 1, 17 (*Landau*); *In re Ronje* (2009) 179 Cal.App.4th 509, 517.)

23

A. *Deficiencies in the Return to the Habeas Corpus Petition*

First, we address Glenn's argument the Attorney General admitted the allegations of the petition for writ of habeas corpus by not filing a formal response admitting or denying the petition's allegations.

In *People v. Duvall* (1995) 9 Cal.4th 464, 474-481, the California Supreme Court thoroughly explained habeas corpus rules and procedures. The *Duvall* court explained the function and requirements of the return: "[W]e have required the return to 'allege *facts* tending to establish the legality of petitioner's detention.' [Citations.] Those facts are not simply the existence of a judgment of conviction and sentence when the petitioner challenges his restraint in prison. The factual allegations of a return must also respond to the allegations of the petition that form the basis of the petitioner's claim that the confinement is unlawful. [Citations.] In addition to stating facts, the return should also, 'where appropriate, . . . provide such documentary evidence, affidavits, or other materials as will enable the court to determine which issues are truly disputed.'" (*Id.* at p. 476, fn. omitted.)

In *County of San Bernardino v. Superior Court* (1994) 30 Cal.App.4th 378, 382, footnote 6, the respondents filed a document called "'responsive brief'" that did not respond to the formal allegations of the petition. The Court of Appeal noted its order issuing an alternative writ requested a formal return, meaning an answer or a demurrer. (*Ibid.*) By filing a responsive brief, the respondents did not follow the correct procedures. (*Ibid.*)

Although the Attorney General's combined respondent's brief and return does not respond to the allegations of the habeas corpus petition by admitting or denying them, that does not mean Glenn is entitled to habeas corpus relief. From the petition and the combined respondent's brief and return, we can tell the relevant facts in this case are essentially not in dispute. The contested issues—whether the assessment protocol is an underground regulation and whether use of the invalid assessment protocol deprived the

24

trial court of fundamental jurisdiction—are legal ones. The return could not formally respond to issues of prejudice or deprivation of a fair trial because the habeas corpus petition made no such allegations. In the combined respondent's brief and return, the Attorney General argues Glenn suffered no prejudice and received a fair trial, thus framing those issues for our review.

B. *2008 OAL Determination No. 19*

The mental health evaluators who performed the section 6601 evaluations of Glenn followed the Clinical Evaluator Handbook and Standardized Assessment Protocol issued by the DMH. In August 2008, the OAL issued a determination that various challenged portions of the standardized assessment protocol used by the DMH for SVPA evaluations—specifically, the Clinical Evaluator Handbook and Standardized Assessment Protocol (2007)—met the statutory definition of a regulation and, therefore, should have been adopted pursuant to Government Code section 11340.5 of the Administrative Procedure Act (Gov. Code, § 11340 et seq.). (2008 OAL Determination No. 19 (Aug. 15, 2008) pp. 1, 13 <http://www.oal.ca.gov/res/docs/pdf/determinations/2008/2008_OAL_Determination_19.pdf> [as of June 5, 2013].) The OAL determined that, as such, the protocol constituted an underground regulation as defined in California Code of Regulations, title 1, section 250, and is therefore invalid. (2008 OAL Determination No. 19, *supra*, at p. 13.) In *In re Ronje*, *supra*, 179 Cal.App.4th at page 516, we concluded the 2007 standardized assessment protocol was invalid as an underground regulation.

C. *Forfeiture*

Challenges based on noncompliance with statutory requirements and regulations pertaining to evaluators should be raised in the trial court. (*In re Wright* (2005) 128 Cal.App.4th 663, 672 [question whether evaluator had requisite degree in psychology was an "evidentiary issue . . . properly left to the trial court"].) In *People v. Medina* (2009) 171 Cal.App.4th 805, 817, the court held the alleged sexually violent

25

predator forfeited a challenge to the validity of the assessment protocol as an underground regulation by failing to raise the issue in the trial court.

Although Glenn did not challenge the validity of the assessment protocol in the trial court, his petition for writ of habeas corpus alleges 2008 OAL Determination No. 19 is "'newly discovered' evidence" justifying habeas relief. The Attorney General does not deny that allegation. (See *People v. Duvall*, *supra*, 9 Cal.4th at p. 476.) Accordingly, we find no forfeiture.

### D. *Prejudice/Fair Trial*

However, any error in using evaluations based on the invalid assessment protocol did not deprive the trial court of fundamental jurisdiction over the petition to commit Glenn as a sexually violent predator.[5] In *People v. Pompa-Ortiz* (1980) 27 Cal.3d 519, 529 (*Pompa-Ortiz*), the California Supreme Court held illegalities in criminal preliminary hearings that are not "jurisdictional in the fundamental sense" are not reversible per se on an appeal following the subsequent trial. Rather, such illegalities must be reviewed "under the appropriate standard of prejudicial error and shall require reversal only if defendant can show that he was deprived of a fair trial or otherwise suffered prejudice as a result of the error at the preliminary examination." (*Ibid.*) Because Glenn did not raise the issue of the invalid assessment protocol until after his commitment as a sexually violent predator, he must show prejudice to obtain relief. (*Landau*, *supra*, 214 Cal.App.4th at p. 17.) Glenn has not shown he was deprived of a fair trial or suffered prejudice as a result of the use of the invalid assessment protocol.

Instructive on the issue of prejudice are cases concerning irregularities in the SVPA probable cause hearing because such irregularities are subject to harmless error

---

[5] The use of the invalid assessment protocol to conduct Glenn's evaluations did not deprive the trial court of the legal power to hear and determine the SVPA commitment petition. (*In re Ronje*, *supra*, 179 Cal.App.4th at p. 518.) "Use of the evaluations based on the invalid assessment protocol, though erroneous, did not deprive the trial court of fundamental jurisdiction over the SVPA commitment petition." (*Ibid.*)

review.  (*People v. Butler* (1998) 68 Cal.App.4th 421, 435 (*Butler*).)  In *Butler*, the defendant challenged his sexually violent predator commitment on the ground the trial court did no more than conduct a facial review of the commitment petition at the probable cause hearing.  (*Ibid.*)  The Court of Appeal agreed the trial court erred by not holding a full evidentiary hearing, but held the *Pompa-Ortiz* rule applied.  (*Butler*, *supra*, at. p. 435.)  The court concluded the defendant suffered no prejudice because "[h]e was found to be an SVP after a trial at which he was able to cross-examine the prosecution's witnesses and call his own witnesses."  (*Ibid.*)

In *People v. Hayes* (2006) 137 Cal.App.4th 34, 44 (*Hayes*), the People filed a petition to recommit the defendant just as the initial term of commitment was about to expire.  Due to numerous delays, the trial on the recommitment petition had not proceeded to trial by the eve of the two-year recommitment period.  (*Ibid.*)  As a result, the People filed a second petition to recommit the defendant for another two-year period.  (*Ibid.*)  The trial court consolidated and tried the two recommitment petitions.  (*Ibid.*)  The probable cause hearing on the second recommitment petition was not conducted until the conclusion of trial.  (*Ibid.*)

The Court of Appeal concluded the trial court erred by conducting the probable cause hearing on the second recommitment petition at the conclusion of trial, but held the error was not prejudicial under the *Pompa-Ortiz* rule.  (*Hayes*, *supra*, 137 Cal.App.4th at p. 49.)  Likening the probable cause hearing under the SVPA to a preliminary hearing in a criminal trial, the court reasoned:  "Defendant did not have a probable cause hearing until after the evidentiary phase of trial had concluded and jury deliberations had begun.  Thus, he had no pretrial probable cause hearing at all.  But like the defendant who has an improper, nonevidentiary hearing—or a criminal defendant who has a preliminary hearing without counsel, in effect no hearing at all—defendant received a full-blown trial and had a jury conclude, beyond a reasonable doubt, that he

27

was an SVP within the meaning of section 6600, subdivision (a)(1)." (*Hayes*, *supra*, at p. 51.)

In *In re Wright*, *supra*, 128 Cal.App.4th at page 673, the court concluded the defendant received a fair trial because he was represented by counsel, presented his own expert witness, and was permitted to cross-examine the People's witnesses. As for prejudice, the *Wright* court stated: "The only possible prejudice [the defendant] could have suffered was in the fact that the petition actually proceeded to trial; however, our high court concluded that the erroneous denial of a motion to dismiss an information under Penal Code section 995 will not be reversed on appeal in the absence of a showing that the defendant was deprived of a fair trial, or otherwise prejudiced in the ability to mount a defense." (*Ibid.*) The fact the defendant was "compelled to 'participate in an otherwise fair trial'" therefore did not establish prejudice. (*Id.* at p. 674.)

Glenn received a fair trial. He was represented by counsel, presented his own witnesses (including two expert witnesses), and cross-examined the People's witnesses. (*Butler*, *supra*, 68 Cal.App.4th at p. 435.) After a full, public trial, a jury found he was a sexually violent predator. We have concluded Glenn's only assertion of error occurring during trial—the limitations on his expert witness's testimony—had no merit.

Nor did Glenn suffer prejudice. The 2008 OAL Determination No. 19 did not suggest the assessment protocol was flawed or unreliable as an instrument for assessing whether a person might be a sexually violent predator. The 2008 OAL Determination No. 19 concerned only the issue whether the assessment protocol was a regulation and expressly stated it was not evaluating its "advisability or . . . wisdom." (2008 OAL Determination No. 19, *supra*, p. 1.) Once the petition was filed, the People could not rely on the evaluations, but were "'required to show the more essential fact'" that Glenn is a sexually violent predator. (*People v. Scott* (2002) 100 Cal.App.4th 1060, 1063.) At the probable cause hearing, Glenn could have challenged the evaluations and

28

cross-examined the evaluators. (*Hayes*, *supra*, 137 Cal.App.4th at p. 43.) He does not contend the invalid assessment protocol was used at the commitment trial, harmed his ability to mount a defense, or in any way influenced the jury in finding him to be a sexually violent predator. He does not challenge the sufficiency of the evidence at either the probable cause hearing or the commitment trial.

Glenn argues, "it is very possible that the [DMH], assuming it follows a fair regulation adoption process, would adopt regulations that create a completely different protocol for the evaluation of sexually violent predators." This type of prejudice is not relevant under a *Pompa-Ortiz* analysis, and Glenn concedes, "it is completely impossible to predict whether [Glenn] will be found to qualify as a sexually violent predator under the new protocol."

Glenn's challenge to the evaluations based on the invalid assessment protocol fails because he received a fair trial and suffered no prejudice under the *Pompa-Ortiz* rule. For the same reason, his claim his trial counsel was ineffective for not challenging the evaluations in the trial court also fails. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-698.) "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." (*Id.* at p. 697; accord, *In re Fields* (1990) 51 Cal.3d 1063, 1079.)

## III.

### *Indeterminate Commitment Under the 2006 Amendments to the SVPA Does Not Violate Due Process, Equal Protection, Ex Post Facto, or Double Jeopardy.*

Glenn argues the SVPA, as amended in 2006, violates the due process, equal protection, ex post facto, and double jeopardy clauses of the United States and California Constitutions. We conclude the 2006 amendments are constitutional.

29

A.  *The Amended SVPA*

As originally enacted, the SVPA provided for a two-year term of confinement for persons civilly committed as sexually violent predators, subject to subsequent petitions for extended commitment.  (Former § 6604.)  The Legislature amended the SVPA, effective September 20, 2006, to provide for indeterminate commitment terms for persons determined to be sexually violent predators.  (Stats. 2006, ch. 337, §§ 55, 56, 62, pp. 2665-2668.)  In the November 2006 general election, California voters approved Proposition 83 (entitled "The Sexual Predator Punishment and Control Act:  Jessica's Law"), which also provided for indeterminate terms of commitment for sexually violent predators.  (Voter Information Guide, Gen. Elec. (Nov. 7, 2006) text of Prop. 83, § 1, p. 127; *id.*, §§ 27, 28, subd. (a), p. 137.)  Proposition 83 went into effect on November 8, 2006.  (Prop. 83, §§ 27, 28, as approved by voters, Gen. Elec. (Nov. 7, 2006); see Cal. Const., art. II, § 10, subd. (a).)[6]  Section 6604 now states:  "If the court or jury determines that the person is a sexually violent predator, the person shall be committed for an indeterminate term to the custody of the [DMH] for appropriate treatment and confinement in a secure facility . . . ."  Thereafter, the committed person can be released without the concurrence or recommendation of the DMH only by petitioning the court for conditional release or unconditional discharge.  (§ 6608, subd. (a).)

"[U]nder Proposition 83, an individual SVP's commitment term is indeterminate, rather than for a two-year term as in the previous version of the [SVPA].  An SVP can only be released conditionally or unconditionally if the DMH authorizes a petition for release and the state does not oppose it or fails to prove beyond a reasonable doubt that the individual still meets the definition of an SVP, or if the individual, petitioning the court on his own, is able to bear the burden of proving by a preponderance

---

[6]  We refer to the SVPA, as amended by the Legislature's 2006 amendments and Proposition 83, as the Amended SVPA.

30

of the evidence that he is no longer an SVP.  In other words, the method of petitioning the court for release and proving fitness to be released, which under the former [SVPA] had been the way an SVP could cut short his two-year commitment, now becomes the only means of being released from an indefinite commitment when the DMH does not support release."  (*McKee I*, *supra*, 47 Cal.4th at pp. 1187-1188.)

Section 6608, subdivision (i) was not amended by Proposition 83 and continues to provide that in a hearing on a committed person's section 6608 petition for release or discharge, "the petitioner shall have the burden of proof by a preponderance of the evidence."  (§ 6608, subd. (i).)  After the trial court denies a section 6608 petition, "the person may not file a new application until one year has elapsed from the date of the denial."  (§ 6608, subd. (h).)

## B.  *Due Process*

Glenn argues his indeterminate commitment term under the Amended SVPA violated the due process clauses of the United States and California Constitutions. In *McKee I*, *supra*, 47 Cal.4th at page 1193, the California Supreme Court held the Amended SVPA does not violate the due process clauses of the federal and state Constitutions.  (See also *People v. McDonald* (2013) 214 Cal.App.4th 1367, 1382; *Landau*, *supra*, 214 Cal.App.4th at p. 44; *People v. McCloud* (2013) 213 Cal.App.4th 1076, 1085 (*McCloud*).)

## C.  *Equal Protection*

Glenn argues that by making a commitment indeterminate and by placing the burden on the sexually violent predator to obtain release, the Amended SVPA violates the constitutional right to equal protection.  We reject Glenn's equal protection challenge.

In *McKee I*, *supra*, 47 Cal.4th at pages 1203, 1207, the California Supreme Court concluded sexually violent predators, persons found to be mentally disordered offenders (MDO's) who have been committed under the Mentally Disordered Offender Act (Pen. Code, § 2960 et seq.), and those committed after being found not guilty by

31

reason of insanity (NGI's) are similarly situated for equal protection purposes. The Supreme Court remanded the matter to the trial court to determine "whether the People, applying the equal protection principles . . . discussed in the present opinion, can demonstrate the constitutional justification for imposing on SVP's a greater burden than is imposed on MDO's and NGI's in order to obtain release from commitment." (*McKee I*, *supra*, at pp. 1208-1209.)

On remand from *McKee I*, the trial court conducted a 21-day evidentiary hearing at which the People presented the testimony of eight witnesses and documentary evidence, and Richard McKee presented the testimony of 11 witnesses and documentary evidence. (*McKee II*, *supra*, 207 Cal.App.4th at pp. 1330, 1332.) The trial court issued a 35-page statement of decision summarizing the testimony and documentary evidence presented at the hearing. (*Id.* at p. 1332.) The trial court found, "the People had met their burden to establish, by a preponderance of the evidence, that the disparate treatment of SVP's under the [Amended SVPA] was based on a reasonable perception of the greater and unique dangers they pose compared to MDO's and NGI's." (*Ibid.*) The court confirmed its prior order committing McKee to an indeterminate term. (*Ibid.*)

In *McKee II*, Division One of the Fourth Appellate District of the Court of Appeal applied a de novo standard of review to "independently determine whether the People presented substantial, factual evidence to support a reasonable perception that SVP's pose a unique and/or greater danger to society than do MDO's and NGI's, thereby justifying the disparate treatment of SVP's under the [Amended SVPA]." (*McKee II*, *supra*, 207 Cal.App.4th at p. 1338.) The Court of Appeal concluded: "[T]he People on remand met their burden to present substantial evidence, including medical and scientific evidence, justifying the [A]mended [SVPA]'s disparate treatment of SVP's (e.g., by imposing indeterminate terms of civil commitment and placing on them the burden to prove they should be released). [Citation.] The People have shown that, 'notwithstanding the similarities between SVP's and MDO's [and NGI's], the former as a

32

class bear a substantially greater risk to society, and that therefore imposing on them a greater burden before they can be released from commitment is needed to protect society.' [Citation.] The People have shown 'that the inherent nature of the SVP's mental disorder makes recidivism as a class significantly more likely[;] . . . that SVP's pose a greater risk [and unique dangers] to a particularly vulnerable class of victims, such as children'; and that SVP's have diagnostic and treatment differences from MDO's and NGI's, thereby supporting a reasonable perception by the electorate that passed Proposition 83 that the disparate treatment of SVP's under the [A]mended [SVPA] is necessary to further the state's *compelling interests* in public safety and humanely treating the mentally disordered. [Citation.]" (*Id.* at p. 1347, italics added.)

The California Supreme Court denied review of *McKee II* and the opinion is final.

In *McDonald*, *supra*, 214 Cal.App.4th at page 1377, and *Landau*, *supra*, 214 Cal.App.4th at page 48, panels of this court found the reasoning and conclusion of *McKee II* to be persuasive and agreed with its equal protection analysis. (See also *McCloud*, *supra*, 213 Cal.App.4th at pp. 1085-1086; *People v. McKnight* (2012) 212 Cal.App.4th 860, 863-864.)

In his supplemental letter brief, Glenn challenges *McKee II* on various grounds, all of which we addressed in *McDonald* or *Landau*. Glenn argues *McKee II* was based on the specific facts presented to the trial court in that case and therefore does not preclude further litigation on the issue whether the Amended SVPA violates equal protection. In *McDonald*, we rejected this argument and concluded: "*McKee I* plainly expressed the Supreme Court's desire to resolve on a classwide basis the equal protection challenge of all SVP's to indeterminate commitments under the Amended SVPA." (*McDonald*, *supra*, 214 Cal.App.4th at pp. 1377-1378.)

Glenn argues the *McKee II* court misunderstood and misapplied the strict scrutiny test and applied the wrong standard of review. We also rejected that argument in

33

*McDonald*, *supra*, 214 Cal.App.4th at page 1379, and in *Landau*, *supra*, 214 Cal.App.4th at pages 47-48.

Glenn argues the evidence presented in the postremand trial following *McKee I* did not support the Court of Appeal's holdings in *McKee II* on the issues of recidivism, trauma to the victims, and treatment differences. We rejected the same argument in *McDonald*, *supra*, 214 Cal.App.4th at pages 1381-1382, and in *Landau*, *supra*, 214 Cal.App.4th at pages 47-48. Glenn argues at length the Court of Appeal's assessment of the evidence in *McKee II* was flawed, but we rejected the same argument in *McDonald*, *supra*, 214 Cal.App.4th at pages 1380-1382. Glenn filed a motion requesting that we take judicial notice of the trial court's statement of decision in the postremand trial in *McKee II*, and we granted his motion. In *Landau*, we also took judicial notice of that statement of decision and "agree[d] with our brethren in Division One" that "[t]he People introduced 'substantial evidence to support a reasonable perception by the electorate that SVP's have significantly different diagnoses from those of MDO's and NGI's, and that their respective treatment plans, compliance, and success rates are likewise significantly different.'" (*Landau*, *supra*, 214 Cal.App.4th at p. 47.)

D. *Ex Post Facto/Double Jeopardy*

Glenn argues the Amended SVPA is punitive rather than civil and therefore violates the ex post facto and double jeopardy prohibitions of the federal and state Constitutions. In *McKee I*, *supra*, 47 Cal.4th at pages 1193, 1195, the California Supreme Court held the Amended SVPA does not violate the ex post facto clause of the federal and state Constitutions. (See also *McDonald*, *supra*, 214 Cal.App.4th at p. 1382; *Landau*, *supra*, 214 Cal.App.4th at p. 44; *McCloud*, *supra*, 213 Cal.App.4th at p. 1085.) In *McDonald*, *supra*, 214 Cal.App.4th at page 1383, we concluded the Amended SVPA does not violate the constitutional prohibition of cruel and/or unusual punishment and indeterminate commitment under the Amended SVPA does not constitute double jeopardy.

**DISPOSITION**

The order of commitment is affirmed.  The order to show cause is dissolved and the petition for writ of habeas corpus is denied.


FYBEL, J.

WE CONCUR:


O'LEARY, P. J.


MOORE, J.